UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2014 SEP 30   PM 3: 31
CLERK
BY _____
DEPUTY CLERK

BARBARA ERNST and           )
BARBARA SUPENO,             )
                            )
   Plaintiffs,             )
                            )
   v.                      )   Case No. 5:14-cv-59
                            )
BARBARA "CAROL" KAUFFMAN,    )
JEFF KAUFFMAN, JOHN CARRIGAN, )
LINDA CARRIGAN, and          )
the TOWN OF ADDISON, VERMONT, )
                            )
   Defendants.             )

**OPINION AND ORDER RE:**
**DEFENDANTS' MOTIONS TO DISMISS COUNT III AND IV AND**
**DEFENDANTS' SPECIAL MOTIONS TO STRIKE THE COMPLAINT**

**(Docs. 44, 42, 38 & 48)**

Pending before the court are four motions filed by the various defendants in this case.
The first and second are motions filed by defendants Jeff Kauffman and Carol Kauffman (Doc.
38), and John Carrigan and Linda Carrigan (Doc. 48), respectively, to strike plaintiffs' complaint
pursuant to Vermont's anti-SLAPP statute, 12 V.S.A. § 1041. The third is a motion to dismiss
Count IV of plaintiffs' amended complaint on the grounds that it is barred by the statute of
limitations, filed by defendants Jeff Kauffman and the Town of Addison. (Doc. 42). Finally,
defendant Jeff Kauffman has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Count III of
plaintiffs' complaint as it relates to him. (Doc. 44.) A hearing on the motions to strike was held
on September 18, 2014. The parties did not request a hearing on the motions to dismiss.

I.     **Background**

The following facts are drawn from plaintiffs' amended complaint. (Doc. 34.) Plaintiffs
Barbara Ernst and Barbara Supeno are an openly gay couple who have lived in their lakefront
home in Addison, Vermont, since 2004. (*Id.* ¶ 1.) Since moving to Addison, they have been
involved with several zoning disputes with adjoining landowners over alleged setback, use and

septic violations by those neighbors. (*Id.* ¶¶ 11-26.) Plaintiffs allege that several of their neighbors, including defendants John and Linda Carrigan, have been openly hostile to them because they are a same-sex couple. These neighbors have allegedly shouted offensive language at them, threatened them with physical harm, trespassed on their property and attempted to intimidate them into moving away. (*Id.* ¶ 7.)

These efforts to drive plaintiffs out of Addison allegedly were encouraged by several town officials, including defendant Jeff Kauffman. Mr. Kauffman has been the chairman of the Addison Selectboard since 2007 and was the town's zoning and planning administrator from 2008 to 2012. (*Id.* ¶¶ 3, 8.) Plaintiffs assert that Mr. Kauffman and the Town of Addison discriminated against them in zoning decisions from 2004 onward, and that these decisions were motivated by anti-homosexual bias based on fundamentalist Christian beliefs held by Mr. Kauffman and others. (*Id.* ¶¶ 10-26.)

On April 11, 2011, an anonymous nine-page letter was sent to numerous Town residents including all of the members of the Selectboard, school board, planning board, and development review board, as well as local newspapers. (*Id.* ¶ 38.) The letter was entitled "The TRUTH About the BARBARAS." (Doc. 34-1 at 3.) The letter contained information drawn from court and police records involving plaintiffs that supposedly demonstrated that plaintiffs were "masters at falsifying information, using harassment as a crutch whenever confronted in their demonical schemes, lying openly, distorting facts, [and] using the court system for extortion." (*Id.* at 4.) It went on to state that plaintiffs were "felons who are running scams," that plaintiff Supeno was a drug addict who lied about her mother's illness to avoid court dates, and that plaintiffs do not pay their creditors or their taxes. (*Id.* at 4-5, 8.) It encouraged the reader to share the letter with neighbors, business people and elected officials. (*Id.* at 4.)

Plaintiffs allege that defendant Carol Kauffman wrote the letter with information provided by her husband Jeff Kauffman and by Linda Carrigan. (Doc. 34 ¶¶ 39-40.) They assert that "[o]n April 11 to 14, 2011 John Carrigan was observed outside the local convenience store handing out copies of the defamatory letter to Town residents." (*Id.* ¶ 41.) Further, Carol Kauffman read aloud from the letter at Selectboard meetings in June, July and August 2011, and John Carrigan presented a document containing information about some of the lawsuits discussed in the letter as well as other disputes involving plaintiffs to the Selectboard in

2

November 2011. (*Id.* ¶¶ 42-43.) Plaintiffs allege that Carol Kauffman also sent a letter to their attorney purporting to be from them that implied that they would not pay him for services he had rendered. (*Id.* ¶¶ 45-46.)

In March 2014, plaintiffs filed suit against the Kauffmans, the Carrigans, and the Town of Addison in Vermont Superior Court. Their complaint, as amended, includes state-law claims against the Kauffmans and the Carrigans for defamation, false-light invasion of privacy, and tortious interference with prospective business relationships, and claims against the Town and Jeff Kauffman for sexual orientation discrimination under 9 V.S.A. § 4503, retaliation in violation of plaintiffs' exercise of their right to free speech under the First Amendment to the U.S. Constitution, and violation of the Common Benefits Clause of the Vermont Constitution, Vt. Const. ch. I, art. 7. (Doc. 34 ¶¶ 50-90.) Based on the First Amendment claim, defendants Jeff Kauffman and the Town of Addison removed the action to this court.

## II.     Special Motions to Strike Filed Under 12 V.S.A. § 1041

Defendants John and Linda Carrigan and Jeff and Carol Kauffman have filed special motions to strike plaintiffs' claims against them pursuant to 12 V.S.A. § 1041, Vermont's anti-SLAPP statute. The purpose of such statutes "is to discourage litigants from filing baseless lawsuits known as Strategic Lawsuits Against Public Participation (SLAPP)." *Haywood v. St. Michael's College*, No. 2:12-CV-164, 2012 WL 6552361, at *12 (D. Vt. Dec. 14, 2012) (quotation omitted). "In such lawsuits, [t]he strategy is to file weak claims with the goal of silencing speakers because they fear the expense and travails of litigation." *Id.* (quotation omitted). Anti-SLAPP statutes are designed to encourage free speech and public participation by allowing swift dismissal of meritless complaints. *Id.*

Vermont's anti-SLAPP statute provides that "[a] defendant in an action arising from the defendant's exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the United States or Vermont Constitution may file a special motion to strike under this section." 12 V.S.A. § 1041(a). The statute creates a two-step burden-shifting process. First, the party bringing the motion to strike must show that the case arises from his or her exercise of the right to freedom of speech or to petition the government. *Id.* The statute protects the following categories of speech or conduct:

(1) [A]ny written or oral statement made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

(2) any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;

(3) any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public; or

(4) any other statement or conduct concerning a public issue or an issue of public interest which furthers the exercise of the constitutional right of freedom of speech or the constitutional right to petition the government for redress of grievances.

*Id.* § 1041(i). Under the plain language of the statute, a defendant does not need to show that a statement concerned the public interest if it falls within subsections (1) or (2). *Du Charme v. Int'l Bhd. of Elec. Workers, Local 45*, 1 Cal. Rptr. 3d 501, 504 (Cal. Ct. App. 2003).

If the defendant shows that the plaintiff's suit arises from one of the above categories, the burden shifts to the plaintiff to show that "the defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law" and that "the defendant's acts caused actual injury to the plaintiff." *Id.* § 1041(e)(1). In deciding whether the plaintiff's suit or cause of action[1] arises from protected activity, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Id.* § 1041(e)(2). Should the plaintiff fail to meet its burden, the court must grant the motion to strike and award costs and attorney's fees to the defendant. *Id.* § 1041(f)(1).

As the Vermont Supreme Court has not interpreted § 1041, "this court may look to any sources on which the state's highest court might rely in order to determine what that court may decide." *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 71 (2d Cir. 2000). In this case, those sources include the text of the statute itself and persuasive authority from

---

[1] Although the statute refers to striking "the complaint," it is reasonable to assume that a trial court may strike claims based on protected activity while permitting unprotected causes of action to remain. *See Cho v. Chang*, 161 Cal. Rptr. 3d 846, 847-48 (Cal. Ct. App. 2013).

California, which has an anti-SLAPP statute that protects a similarly broad range of activity by defendants.[2]  *Compare* Cal. Civ. Proc. Code § 425.16, *with* 12 V.S.A. § 1041.

As a threshold matter, plaintiffs argue that the Carrigans' motion to strike (Doc. 48) was untimely because it was filed more than sixty days after plaintiffs filed their original complaint in state court.  *See* 12 V.S.A. § 1041(b) ("A special motion to strike under this section shall be filed with the court and served on all parties not more than 60 days after the filing of the complaint."). The statute does not define "the complaint."  This court believes, however, that the Vermont Supreme Court would interpret "the complaint" to include amended complaints.  "[T]he purpose of the anti-SLAPP suit law would be readily circumventable if a defendant's only opportunity to strike meritless SLAPP claims were in an attack on the original complaint," because anti-free-speech claims could be omitted from the original complaint and then added after the sixty-day period ran.  *Lam v. Ngo*, 91 Cal. App. 4th 832, 840 (Cal. Ct. App. 2001).  In light of the intended purpose of the statute, which is to swiftly dispose of meritless lawsuits targeted at those who exercise their rights of free speech and petition, this court interprets "the complaint" to include plaintiffs' amended complaint.  Under this interpretation, the Carrigans' motion was timely because it was filed within sixty days of plaintiffs' amended complaint.

### A. April 2011 Anonymous Letter

The court thus proceeds to the first prong of the analysis under § 1041: whether defendants have met their burden of showing that plaintiffs' claims arise from defendants' exercise of their right to freedom of speech or to petition the government.  Viewing the complaint as a whole, the court concludes that plaintiffs' claims of defamation, invasion of privacy and interference with prospective business relationships against both the Carrigans and the Kauffmans arise primarily from the anonymous letter that was distributed to Town residents in April 2011.  Plaintiffs allege that between April 11 and 14, 2011, Carol and possibly Jeff Kauffman wrote and sent out the anonymous letter and that John Carrigan handed out copies of

---

[2]  Vermont's statute places a higher burden on plaintiffs under the second prong of the analysis than California's statute, which requires only that the plaintiff establish "a probability that the plaintiff will prevail on the claim" to defeat an anti-SLAPP motion.  Cal. Civ. Proc. Code § 425.16(b)(1).

the letter in front of a local store.  (Doc. 34 ¶¶ 38-39, 41.)  The question then becomes whether this conduct was protected by the statute.

Defendants first argue that the anonymous letter was distributed in connection with "the Addison Select Board and Planning Commission review of changes to Addison's zoning regulations and the School Board's consideration of the school unification issue," and thus is protected under § 1041(i)(2).  (Doc. 48 at 19.)  The court does not find this argument to be persuasive.  The letter makes no reference to either of these issues other than to say that plaintiffs "have been passing themselves off as involved citizens and very concerned about town direction and in particular with Zoning, the schools and the environment."  (Doc. 34-1 at 4.)  The letter does not advocate for any position or directly address these issues at all.  Rather, it can be fairly described as an attack on the character and reputation of plaintiffs, matters that were not under review by any governmental body.  Any connection between the letter and the issues being considered by the Selectboard or other town boards is tenuous at best.

Defendants also argue that they are protected by § 1041(i)(3) and (4), because the letter was distributed "in a public forum or place open to the public" and the statements therein concerned a "public issue" or an "issue of public interest."  (Doc. 38 at 8-12; Doc. 48 at 19.)

Plaintiffs do not dispute that the statements were made in a public forum or a place open to the public.  The April 2011 anonymous letter was sent to numerous townspeople and local newspapers, and encouraged readers to share it with others.  Further, the area outside the local convenience store where John Carrigan allegedly distributed the letter was presumably open to the public.  Indeed, such areas typically qualify as public fora.  *See State v. McHugh*, 635 A.2d 1200, 1201 (Vt. 1993) ("Public streets and sidewalks are traditional public fora for purposes of free expression.").

Plaintiffs vigorously deny that the statements involved an issue of public interest, however.  California appellate courts have identified some factors relevant to determining whether a statement concerned a matter of public interest, including:

> [W]hether (1) the subject of the statement or activity precipitating the claim was a person or entity in the public eye; (2) [whether] the statement or activity precipitating the claim involved conduct that could affect large numbers of people

6

beyond the direct participants; and (3) whether the statement or activity precipitating the claim involved a topic of widespread public interest. *Wilbanks v. Wolk*, 17 Cal. Rptr. 3d 497, 506 (Cal. Ct. App. 2004). In addition to these factors, "there should be some degree of closeness between the challenged statements and the asserted public interest." *Weinberg v. Feisel*, 2 Cal. Rptr. 3d 385, 392 (Cal. Ct. App. 2003).

A statement may concern an "issue of public interest" even if it is of interest to only a limited portion of the public, such as the members of a particular community or private organization. *See Damon v. Ocean Hills Journalism Club*, 102 Cal. Rptr. 2d 205, 212-13 (Cal. Ct. App. 2000) (holding that statements made by members of homeowners association's board of directors and published in community newsletter criticizing performance of manager of 3,000-member association involved public interest within meaning of California's anti-SLAPP statute). However, "a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest." *Weinberg*, 2 Cal. Rptr. 3d at 392 (holding that statements by defendant who published advertisement in token collecting newsletter circulated to 700 members that plaintiff had stolen valuable item from defendant did not involve matter of public interest).

Defendants argue that plaintiffs were in the public eye within the town of Addison due to their involvement in town affairs.[3] (Doc. 38 at 10, Doc. 48 at 21.) Under California jurisprudence, the standard for determining whether a person is "in the public eye" appears to be similar if not identical to the standard for determining whether a person is a "public figure" under First Amendment defamation law. *See, e.g., Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 684-85 (Cal. Ct. App. 1999) (holding that article about political consultant allegedly beating his wife involved public issue because it was about domestic violence and plaintiff was "nationally known figure identified with morality campaigns for national leaders" who "injected himself into the controversy by using his influential position and his ready access to the press to

---

[3] The Carrigans provided over 400 pages of material in support of their motion to strike. Plaintiffs object that several of the exhibits are irrelevant or consist of inadmissible hearsay or character evidence. The court treats motions to strike filed under § 1041 in the same manner as summary judgment motions, *see Bible & Gospel Trust v. Twinam*, No. 1:07-cv-17, 2008 WL 5245644 (D. Vt. Dec. 12, 2008) (Doc. 105), and thus will consider evidence submitted related to defendants' motion to the extent that it would be admissible at trial. This includes statements made by plaintiffs at various town meetings and in newspapers. *See* Fed. R. Evid. 801(d)(2)(A).

define crime and violence as central issues in American politics"). Under the latter, a person may become a public figure in one of two ways: by "achiev[ing] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," or where he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

Plaintiffs were not public officials or candidates for office when the statements at issue were made.[4] Plaintiffs were also not so famous or notorious that they became public figures for all purposes. *See Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980) ("[A] general public figure is a well-known 'celebrity,' his name a 'household word.'"); *Carson v. Allied News Co.*, 529 F.2d 206, 209-10 (7th Cir. 1976) (holding that well-known entertainer Johnny Carson was "all-purpose public figure").

Although plaintiffs were involved in two rounds of litigation with their neighbors on Fisher Point Road, there is no evidence that those disputes were a matter of public interest or controversy at the time the statements were made. Nor did plaintiffs inject themselves into a public controversy by filing their complaint with the Human Rights Commission, which was pending at the time the statements were made. *See Burns v. Times Argus Ass'n, Inc.*, 430 A.2d 773, 776 (Vt. 1981) (explaining that "those people involved in litigation, which becomes the subject of press attention," do not thereby become limited purpose public figures; they "are 'drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or others'" (quoting *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976)). Similarly, plaintiffs' participation in zoning board of adjustment and development review board meetings to discuss their own permit applications or to challenge permits issued to their neighbors that they believed were improper

---

[4] Neither plaintiff was a candidate for public office at the time that the anonymous letter was disseminated. Although Ms. Supeno nominated herself as a candidate for a vacant spot on the Addison Planning Commission in February 2011 (Doc. 48-15), the Selectboard had appointed a different person to fill the position before the anonymous letter was sent out. (Doc. 48-9 at 49.) She subsequently requested reconsideration of the decision in a July 5, 2011 letter to the Selectboard, but there is no indication that Ms. Supeno objected to the decision before then. (Doc. 38-4 at 8.) Thus, when the letter was circulated, the vacancy had apparently been filled.

did not constitute voluntary injection into a public controversy. (Doc 48-11.) These disputes were of interest to and affected a relatively small number of people.

On the other hand, plaintiffs regularly attended Selectboard and planning board meetings from 2009 to 2011 and commented on proposed changes to townwide zoning regulations, a matter of public concern in the Town of Addison. (Docs. 48-9, 48-10; 38-3.) After the Town adopted new zoning regulations in 2010, Ms. Supeno objected at a Selectboard meeting that the changes were not adopted using the proper procedure. (Doc. 48-9 at 33.) Plaintiffs provided comments about this issue to the local newspaper on two occasions. (Doc. 48-16 at 2-3, 8.) Further, plaintiffs attended several school board meetings at which one of the topics of discussion was whether Addison's schools should be unified with those of other towns, and also attended a local forum on this topic. (Docs. 38-6; 48-16 at 4.) Plaintiffs were quoted on this topic in the local newspaper as well. (Doc. 48-16 at 4-6.) These were matters that could affect the entire town, and plaintiffs voluntarily participated in the public discussion of both issues.

However, even if plaintiffs were considered to be limited-purpose public figures with regard to the issues of zoning or school unification in the Town of Addison, there was no connection between the allegedly defamatory statements and these issues. *Weinberg v. Feisel*, 2 Cal. Rptr. 3d 385, 392 (Cal. Ct. App. 2003). The statements contained in the anonymous letter did not attempt to educate the reader or advocate for a particular outcome about the issues of the new zoning regulations or school unification. Indeed, the letter did not mention these issues at all. The statements were concerned primarily with issues of purely private concern, such as plaintiffs' dealings with their creditors and civil litigation with their neighbors.

In several places, the letter implied or stated outright that plaintiffs were dishonest, statements that could be of widespread public interest if they related to a public official's or political candidate's fitness for office, see *Damon*, 102 Cal. Rptr. 2d at 212-13, or if they were directed to consumers of a businessperson's services or products. *Wilbanks*, 17 Cal. Rptr. 3d at 506. But plaintiffs were simply citizens of the town whose honesty was not a matter that affected the public in general. Plaintiffs may have become objects of widespread public interest after the letter was circulated as a result of the statements in the letter itself, but this does not bring the statement under the protection of § 1041. *See Weinberg*, 2 Cal. Rptr. 3d at 395 ("The fact that defendant's statements accuse plaintiff of criminal conduct make them defamatory on

9

their face.  It does not automatically make them a matter of public interest.").  "[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."  *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).

Even if plaintiffs were in the public eye due to their participation in the zoning and school unification issues, which were matters of public interest, the anonymous letter was insufficiently connected to plaintiffs' role in those issues and thus did not itself concern a public issue or matter of public interest.  Accordingly, defendants have not met their burden under the first prong of the anti-SLAPP statute.  The court therefore DENIES their motions to strike to the extent that plaintiffs' claims are based on the publication of the anonymous letter in April 2011. (Docs. 38, 48.)

### B.    Statements Made by Defendant Carol Kauffman Before the Selectboard

In addition to the publication of the anonymous letter to residents of Addison, plaintiffs allege that defendant Carol Kauffman read selections from the defamatory letter to the Addison Selectboard and attending members of the community.  (Doc. 34 ¶ 42.)  These allegations are treated differently from the distribution of the anonymous letter because they concern statements "made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law."  12 V.S.A. § 1041(i)(1).  Subsection (i)(1) contains no requirement that the statement concern "an issue of public interest."  Instead, any statement made in the course of a selectboard meeting qualifies as the exercise of free speech giving rise to the right to file a special motion to strike.

Since Carol Kauffman has shown that her statements before the Selectboard were protected by § 1041(i)(1), the court turns its attention to whether plaintiffs have met their burden under § 1041(e).  This provision requires plaintiffs to demonstrate through the pleadings and affidavits that "the defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law."  12 V.S.A. § 1041(e)(1).

Plaintiffs have failed to meet their burden on this issue.  First, nowhere in the filings of either side is there any specific account of what Carol Kauffman said in the course of the Selectboard meetings.  In their memorandum in opposition to the Kauffmans' motion, plaintiffs

state only that "[a]t a number of Selectboard meetings in 2011, both Jeff and Carol Kauffman spoke publicly about our discrimination 'law suit.'" (Doc. 46-1 ¶ 15.)  The court has no information from the memorandum or the accompanying affidavits about what defamatory statements were made.

Turning to the complaint itself, the court finds more specific allegations that "[a]t three separate meetings of the Town Selectboard, in June, July, and August, 2011; Carol Kauffman went before the Board and read selections from the defamatory letter to the Board and attending members of the community." (Doc. 34 ¶ 42.)  This unsworn pleading also fails to meet plaintiffs' burden of demonstrating that Ms. Kauffman made defamatory statements that were "devoid of any reasonable factual support." 12 V.S.A. § 1041(e)(1).  The anonymous letter as a whole contains a mixture of true statements, false statements, and editorial characterization. A few statements in the letter are demonstrably false—notably the description of plaintiffs as "felons."  But there is no evidence from plaintiffs that Carol Kauffman read that portion of the letter at the meeting.  Since plaintiffs' claim is that unspecified portions of the letter were read aloud, they bear the burden of proving that the letter as a whole is devoid of factual support.

The anonymous letter was distributed with attachments which have not been provided to the court.  The parties represented to the court at the motion hearing that the attachments were similar to the document presented by John Carrigan to the Selectboard in November 2011.  That document consists of legal pleadings and decisions in prior cases involving plaintiffs, collection letters relating to unpaid accounts, mechanics' liens, bankruptcy filings, and an internet advertisement for the rental of plaintiffs' home. (Doc. 34-2).  These are "true" in the sense that no one claims they are fabricated.

As noted above, the text of the anonymous letter contains a few statements that are demonstrably false, such as the accusation that plaintiffs are felons, as well as more subjective claims that plaintiffs are "accomplished con artists," manipulative, and unwilling to pay their bills. (Doc. 34-1 at 4-5.)

Plaintiffs responded to these statements in the affidavits attached to their opposition memorandum.  The affidavits are insufficient to establish that the anonymous letter was devoid of any reasonable factual support.  Plaintiff Supeno denies using her late mother's final illness

11

"as an excuse for avoiding court dates or other personal commitments," denies that she has ever been a drug addict or a felon, denies that she has taken advantage of her brother or that he is disabled, denies that she filed for bankruptcy (although she admits that plaintiff Ernst did so), and denies that she feigned illness in her Massachusetts worker's compensation case (although she admits that she lost due to multiple preexisting conditions). She admits that she was sued by her former law firm and a house painter for unpaid charges and states that she subsequently paid both balances. She denies any problem with her septic system or with the rental of plaintiffs' home. She concludes that the letter contains other false claims "too numerous to catalog completely." (Doc. 46-1 ¶¶ 21-31.)

Plaintiff Ernst repeats some of the statements in the Supeno affidavit. She states that she is not a felon, that she (but not Supeno) filed for bankruptcy, and that following discharge, she has voluntarily paid "most of my creditors the money that was owed them." Like plaintiff Supeno, she denies all of the subjective charges that she is "diabolical," "cunning, deranged, and dangerous," as well as other highly uncomplimentary attributes. (Doc. 46-3 ¶¶ 15-18.)

These assertions do not show that the letter as a whole was devoid of any reasonable factual support. There is record evidence that various contractors filed suit against plaintiffs due to late payment or went unpaid at least for a time because plaintiff Ernst filed for bankruptcy. Plaintiffs do not respond at all to many of the remaining assertions in the anonymous letter, such as claims that they made false accusations against neighbors, that they were late in paying their architect, that they were at risk of foreclosure, or that they are violating their zoning permit by occupying their home on a full-time basis.

Because there is no evidence of what portions of the letter were read aloud by Carol Kauffman, and plaintiffs have not established that the anonymous letter is *entirely* false such that any portion read aloud would be devoid of factual support, the court GRANTS the special motion to strike with respect to claims arising from any statements made at Selectboard hearings by defendant Carol Kauffman.

### C. Document Presented to Selectboard by John Carrigan

Like the statements made by defendant Carol Kauffman, the document presented to the Selectboard by defendant John Carrigan in November 2011 is protected by § 1041(i)(1) because

12

it was made before an official proceeding.  (Doc. 34-2).  Thus, plaintiffs must show that the document was "devoid of any reasonable factual support."  12 V.S.A. § 1041(e)(1).

Plaintiffs point to two statements in the November 2011 document that they claim are false and unsupported.  (Doc. 54 at 24-25.)  The first refers to a debt collection suit filed against plaintiffs by their former law firm and a small claims action filed against them by their house painter: "Just the fact [that] they are dragged through the courts is an indication of the tactics used to delay or not pay creditors."  (Doc. 34-2 at 4.)  Plaintiffs have not shown that this statement is devoid of any reasonable factual support.  The excerpted case files contained in the document show that two creditors sued plaintiffs to collect debts, suggesting that they were late in paying or did not pay their debts.

The second statement identified by plaintiffs as false is the statement that "[u]nfortunately for [Dempsey (the house painter),] many bills had been charged to Barbara Ernst who had filed for BANKRUPTCY in 9/17/10.  So, even though Dempsey won in small claims court his fee was discharged in Bankruptcy Court."  (Doc. 34-2 at 7.)  This statement is also not devoid of factual support.  The document contains excerpts from the small claims file showing that Dempsey sued plaintiff Ernst to recover unpaid bills, and the portion of plaintiff Ernst's bankruptcy petition that is excerpted in the document lists Dempsey as a creditor.  (*Id.* at 7-8, 16.)  Although plaintiffs may have eventually paid Dempsey, this does not show that the above statement was devoid of factual support.

Plaintiffs assert that "[t]here are numerous other obviously false assertions contained in the defamatory materials the Carrigans published."  (Doc. 54 at 25.)  They do not identify any other false statements in the November 2011 document, however.  As discussed above, the document is made up almost entirely of copies of public records interspersed with comments that are not obviously false.  (Doc. 34-2.)  Plaintiffs have failed to meet their burden under § 1041(e).  The court therefore GRANTS the Carrigan defendants' motion to strike with regard to the November 2011 document.

### D.  Letter to Attorney Jewett

Entirely apart from the anonymous letter, plaintiffs accuse Carol Kauffman of sending a defamatory letter to their attorney Willem Jewett.  The letter was written in the form of a hoax

and suggests that plaintiffs will not pay their lawyer. Ms. Kauffman does not claim that this letter is subject to the anti-SLAPP statute. It gives rise to a separate claim of defamation independent of the anonymous letter. The motion to strike is DENIED with regard to the letter to Attorney Jewett.

**III.   Defendants Jeff Kauffman and Town of Addison's Motion to Dismiss Count IV**

In Count IV of their amended complaint, plaintiffs allege that Mr. Kauffman and the Town discriminated against them in zoning and permitting decisions on the basis of their sexual orientation in violation of the Vermont Fair Housing and Public Accommodations Act (VFHA), 9 V.S.A. § 4503(a)(12). The Town and Mr. Kauffman have moved to dismiss Count IV on the ground that it is barred by the applicable statute of limitations. They contend that Vermont's three-year statute of limitations applies to plaintiffs' claim, and that all of the alleged discrimination took place more than three years before they filed suit.

Defendants correctly point out that federal courts must apply the state limitations period applicable to personal injury actions to federal constitutional claims brought under 42 U.S.C. § 1983. *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Wilson v. Garcia*, 471 U.S. 261, 280 (1985). However, the same is not true of state-law claims, which are governed by whatever state statute of limitations is applicable to the specific cause of action. *See Murray v. Admin. for Children's Servs.*, 476 F. Supp. 2d 436, 441 (S.D.N.Y. 2007) (applying state limitations period for personal injury suits to claims brought under § 1983 and different state limitations period to state-law claims for false arrest, false imprisonment, and malicious prosecution); *see also Harrison v. City of Akron*, 43 Fed. App'x 903, 904-05 (6th Cir. 2002) (holding that district court erred in applying same state limitations period to plaintiff's state-law claims as it did to § 1983 claims).

The VFHA itself contains no applicable statute of limitations. *See* 9 V.S.A. §§ 4500-4507. Thus, this court must determine whether plaintiffs' VFHA claim is governed by Vermont's general six-year statute of limitations for civil actions, 12 V.S.A. § 511, or the three-year statute of limitations for personal injury actions, 12 V.S.A. § 512(4). Defendants argue that plaintiffs' VFHA claim is essentially a personal injury claim, and therefore is governed by § 512(4).

Under Vermont decisional law, "it is the nature of the harm done, rather than the plaintiff's characterization of the cause of action, that determines which statute of limitations governs." *Egri v. U.S. Airways, Inc.*, 804 A.2d 766, 767 (Vt. 2002) (quotation omitted). The Vermont Supreme Court has held that "where a complaint clearly alleges injury covered by § 512 and injury covered by § 511, the two different limitation periods apply, even though there is only one wrongful act." *Id.*; see also *Eaton v. Prior*, 58 A.3d 200, 206 (Vt. 2012) (reaffirming principle expressed in *Egri*).

In *Fitzgerald v. Congleton*, the plaintiff alleged that defendant's legal malpractice caused her to lose custody of her son. 583 A.2d 595, 596 (Vt. 1990). She sought damages for emotional distress and personal humiliation, as well as "the costs incurred by her to secure the return of her child, including such expenses as her attorney's fees." *Id.* at 601. The Court concluded that the nature of the harm alleged by plaintiff was "mixed": some of her injuries were personal injuries within the meaning of § 512(4), and were therefore time-barred. *Id.* at 599-600. Other damages sought by the plaintiff were "for economic losses that do not constitute personal injuries," including the attorney's fees that she incurred in recovering custody of her child. *Id.* at 601. The Court held that these latter injuries fell under the six-year limitations period of § 511.

Similarly, in *Egri v. U.S. Airways, Inc.*, the plaintiff sued her former employer, claiming that it had refused to accommodate her disability in violation of the Vermont Fair Employment Practices Act (FEPA) prohibiting discrimination against qualified individuals with disabilities. 804 A.2d at 767. The plaintiff claimed that she had suffered lost income and benefits, as well as emotional distress. The Vermont Supreme Court, answering a certified question from this court, rejected the suggestion that it should follow federal precedent and hold that all FEPA discrimination claims should be governed by a single three-year statute of limitations "because the essence of the claim is 'an injury to the individual rights of the person.'" *Id.* at 769 (quoting *Wilson*, 471 U.S. at 277). Instead, it followed its earlier decision in *Fitzgerald* and looked to the nature of the harm alleged by the plaintiff. *Id.* The court ruled that plaintiff's emotional distress claim was governed by § 512(4) and was time-barred, while her claim for lost wages and benefits was governed by the six-year period of § 511 and could proceed. *Id.*

The Vermont Supreme Court's decision in *Egri* suggests that it is unlikely to apply a single time limitation to all VHFA discrimination claims. Rather, the court consistently has

required an examination of "the nature of the harm done" to determine what statute of limitations applies. *Eaton*, 58 A.3d at 206 (quotation omitted).

In their amended complaint, which this court must accept as true for the purposes of the motion to dismiss, plaintiffs allege that in September 2008 the Town improperly cited them for a violation of the Town's fence height regulation, forcing them to hire an attorney to defend themselves. (Doc. 34 at ¶¶ 22, 24.) They further allege that in 2009 or thereafter, Mr. Kauffman and the Town tried to prevent Ms. Supeno and her brother from obtaining a certificate of occupancy for a house they were building by finding imaginary building code violations, forcing them to hire an attorney to obtain the certificate. (*Id.* ¶ 19.) Finally, they allege that between 2007 and 2013, the Town improperly issued building permits to the Carrigans for construction that threatened to adversely impact the value of plaintiffs' property and did not notify plaintiffs prior to the issuance of the permits, and that they incurred significant legal expenses challenging the permits in the state environmental court. (*Id.* ¶¶ 25-26.) Plaintiffs allege that the actions taken by the Town and Jeff Kauffman "harmed [plaintiffs'] rights to privacy, peace, and quiet enjoyment of their property"; "created and fostered an extremely hostile environment that caused [plaintiffs] to feel unsafe"; and "cause[d] financial harm to [plaintiffs], requiring them to expend substantial sums on attorneys' fees, and eventually forcing them into bankruptcy." (*Id.* ¶ 78.)

Plaintiffs' complaint is similar to the complaint in *Fitzgerald* and *Egri* in that the nature of the alleged harm is "mixed." *Fitzgerald*, 583 A.2d at 599. The complaint pleads injuries that are nonpersonal in nature, such as interference with the plaintiffs' use and enjoyment of their property and the costs incurred to challenge the allegedly discriminatory actions. *See Fitzgerald*, 583 A.2d at 601 (holding that plaintiff's claims for costs incurred in remedying defendant's tortious action, including attorney's fees, were governed by § 511); *Alpstetten Ass'n, Inc. v. Kelly*, 408 A.2d 644, 646 (1979) (holding that claim for tortious interference with enjoyment of property was governed by § 511). These claims are governed by § 511. Many of plaintiffs' alleged injuries occurred within the six-year period provided by that statute.

Defendants argue that "[t]hough Plaintiffs have alleged some financial harm in the form of attorney's fees, the 'gravamen or essence of the claim' is 'properly characterized as personal injuries, and the fact that some economic losses were also alleged did not alter the essence or underlying nature' of their claim." (Doc. 42 at 8.) Defendants point to *Rennie v. State* in support

of their argument.  In that case, the Vermont Supreme Court held that although the plaintiff alleged that she lost income and other employment benefits as a result of defendants' tortious interference with her employment contract, the essence of her claim "was that she was so physically and emotionally besieged that she had to resign," and thus her entire claim was governed by § 512(4).  762 A.2d 1272, 1276 (Vt. 2000).  Unlike the complaint in *Rennie*, however, the "gravamen or essence" of plaintiffs' complaint is dual in nature—plaintiffs have clearly alleged both personal and nonpersonal injuries.  See *Egri*, 804 A.2d at 768 (distinguishing *Rennie* as a case where the court had to categorize a "vaguely-worded complaint," as opposed to Egri's complaint, which clearly alleged injury covered by § 511 and by § 512(4)).  Plaintiffs' entire VFHA claim therefore is not governed by a single statute of limitations.  Defendants have failed to meet their burden of proving that plaintiffs' VFHA claim is time-barred.[5]

Defendants suggest that plaintiffs are precluded from litigating their VFHA claim in this court because they filed a complaint with the Vermont Human Rights Commission (HRC), but withdrew the complaint before it was resolved.  (Doc. 42-1 at n.2.)  The statute permits a person aggrieved by a violation of the VFHA to file a charge of discrimination with the Vermont Human Rights Commission or to bring suit in superior court.  As a threshold matter, the VFHA does not require a plaintiff to exhaust his or her remedies before the HRC before filing suit in court.  *See* 9 V.S.A. § 4506(d) ("The initiation or completion of an investigation by the Human Rights Commission shall not be a condition precedent to the filing of any lawsuit for violation of this chapter.").  The VFHA also does not explicitly prohibit a plaintiff from refiling a complaint in court after withdrawing the complaint from the HRC.  A plaintiff would likely be barred by principles of issue and claim preclusion from pursuing claims in court that had already been fully investigated and acted upon by the HRC.  However, in the absence of statutory language limiting the right to withdraw from one tribunal and refile in another, and given the remedial nature of the statute, this court does not find that plaintiffs' VHFA claim is barred on these grounds.  *See*

---

[5]  In reaching this conclusion, the court does not intend to suggest that the statute of limitations defense is completely unavailable to defendants.  Further factual development may demonstrate that some portion of plaintiffs' VFHA claim is time-barred.  The court need not resolve this question at the motion-to-dismiss stage. See *Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 542 (7th Cir. 2005) ("Unless the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development.").

*Human Rights Comm'n v. LaBrie, Inc.*, 668 A.2d 659, 665 (Vt. 1995) (stating that VHFA "is a remedial statute" that courts must construe generously and exemptions must be read narrowly).

Defendants further argue that collateral estoppel bars plaintiffs' VFHA claim to the extent that it relies upon the issuance of permits to the Carrigans between 2007 and 2013, because Vermont's environmental court ruled that the Carrigan permits were properly issued.

The doctrine of collateral estoppel, also known as issue preclusion, prevents relitigation of an issue that has been raised and decided in an earlier proceeding. A federal court must "refer to the preclusion law of the State in which judgment was rendered" to determine the preclusive effect of the judgment. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). Under Vermont law, issue preclusion applies to a given issue if:

> (1) [P]reclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

*Trepanier v. Getting Organized, Inc.*, 583 A.3d 583, 588 (Vt. 1990). Issue preclusion may be applicable to an administrative proceeding if the agency was acting in a judicial capacity. *Sheehan v. Dep't of Emp't and Training*, 733 A.2d 88, 91 (Vt. 1999).

In this case, there is no evidence that plaintiffs raised their VFHA claim before the environmental court. Moreover, the environmental court did not have jurisdiction to rule on a VFHA discrimination claim. *See* 4 V.S.A. §§ 30, 34 (describing limited jurisdiction of environmental division of superior court). Thus, plaintiffs did not have an opportunity to raise this issue previously. They are not barred from now litigating the issue by issue preclusion.

Defendants' motion to dismiss Count IV (Doc. 42) is DENIED.

## IV.   Defendant Jeff Kauffman's Motion to Dismiss Count III

Count III of plaintiffs' amended complaint alleges that the Kauffmans and the Carrigans tortiously interfered with plaintiffs' prospective business relationships. Defendant Jeff Kauffman argues that plaintiffs have failed to state a claim against him for interference because they do not allege that he knew of any valid business relationship or expectancy. To survive a

motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Under Vermont law, to state a claim for interference with a prospective business relationship, a plaintiff must allege facts showing:

> (1) [T]he existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference on the part of the interferer; (4) damage to the party whose relationship or expectancy was disrupted; and (5) proof that the interference caused the harm sustained.

*J.A. Morrissey, Inc. v. Smejkal*, 6 A.3d 701, 708-09 (Vt. 2010). The tort applies to a business relationship or expectancy that "is only prospective, though there must exist a reasonable probability that a business or contractual relationship would have arisen but for the conduct of the defendant." *Id.* Knowledge of the existence of the specific relationship or expectancy is an essential element to the claim. *Williams v. Chittenden Trust Co.*, 484 A.2d 911, 914 (Vt. 1984); *see also Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 351 (S.D.N.Y. 2013) ("[I]n order to withstand a motion to dismiss, the complaint must allege both that the defendant interfered with a specific relationship, and that the defendant knew about the relationship at the time of the alleged interference."); Restatement (Second) of Torts § 766 cmt. i ("To be subject to liability . . . the actor must have knowledge of the contract with which he is interfering . . . .").

Plaintiffs allege that John Carrigan contacted several contractors with whom plaintiffs had either contracted for services or intended to contract for services and told these contractors that plaintiffs would never pay for their work. They further allege that Mr. Carrigan provided some of these contractors with copies of the anonymous letter. (Doc. 34 ¶¶ 61-71). Plaintiffs do not allege that Jeff Kauffman contacted any contractors or provided anyone with the letter.

Instead, plaintiffs assert that Jeff Kauffman is liable for interference with business relationships because he "assisted in the publication" of the anonymous defamatory letter. While this might suffice to establish the element of intentional interference, it does not satisfy the

19

knowledge requirement, because there is no allegation that Mr. Kauffman knew about any of plaintiffs' business relationships, existing or intended.

Plaintiffs argue that they do not have to show that Mr. Kauffman knew the specific identity of the other parties to a prospective business relationship, only that he knew the prospective relationship existed. They assert that because the letter was directed to the entire town, defendants knew that the letter was "likely to dissuade *someone* from doing business with" plaintiffs because "they knew that the Plaintiffs, like anyone, had ongoing business relationships with local businesspeople." (Doc. 58 at 6.) The cases cited by plaintiffs do not support their interpretation of the rule. In all but one of these cases,[6] the defendant knew that the plaintiff intended to engage in a particular transaction such as selling a parcel of real property, *Teitel v. Wal-Mart Stores, Inc.*, 287 F. Supp. 2d 1268, 1281 (M.D. Ala. 2003), or a business, *Hubbard Chevrolet Co. v. General Motors Corp*, 682 F. Supp. 873, 878 (S.D. Miss. 1987), but did not know the identity of the other party to the intended transaction. Under those circumstances, the courts held that the element of knowledge was satisfied by a showing that the tortfeasor knew that the plaintiff had a prospective business relationship with someone. *Teitel*, 287 F. Supp. 2d at 1281; *Hubbard*, 682 F. Supp. at 878; *see also Kelly-Springfield Tire Co. v. D'Ambro*, 596 A.2d 867, 871 (Pa. Super. Ct. 1991); *Personnel Dep't, Inc. v. Professional Staff Leasing Corp.*, 297 Fed. App'x 773, 777 (10th Cir. 2008). By contrast, plaintiffs in this case have not alleged that Mr. Kauffman knew or had reason to know of any specific business relationships or expectancies or that plaintiffs intended to engage in any particular transactions. The knowledge element would become meaningless if it were sufficient for a plaintiff merely to allege that a defendant knew that the plaintiff would engage in some kind of business at some point in the future.

---

[6] Plaintiff also cites to *Criterion 508 Solutions, Inc. v. Lockheed Martin Services, Inc.*, in which the court stated that under Iowa law, "the interfering party's knowledge does not need to be actual, as it is sufficient that the defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to the disclosure of the contractual relationship between plaintiff and third parties." 806 F. Supp. 2d 1078, 1100 (S.D. Iowa 2009) (quotation omitted). In that case, the court held that although the defendant knew that its employee had formerly worked for the plaintiff, the plaintiff had not shown that the defendant knew that the employee had signed a contract with plaintiff that restricted her ability to work in the parties' industry or that defendant intended to interfere with that restrictive covenant. Plaintiffs have not shown that this is the rule in Vermont. However, even if it were, plaintiffs have not shown that Jeff Kauffman had inquiry notice of prospective business relations between plaintiffs and the various contractors they mention in their complaint. *Id.*

20

Accordingly, defendant Jeff Kauffman's motion to dismiss Count III of plaintiffs' complaint as it relates to him is GRANTED.  (Doc. 44.)

## V.       Conclusion

For the reasons discussed above, defendants' motions to strike are DENIED with respect to claims arising from the anonymous letter and the letter to Attorney Jewett, and GRANTED with respect to claims arising from Carol Kauffman's and John Carrigan's statements before the Selectboard.  Defendants' motion to dismiss Count IV is DENIED.  Defendant Jeff Kauffman's motion to dismiss Count III as to himself is GRANTED.

Dated at Rutland, in the District of Vermont, this 30th day of September, 2014.


                                                        _____
                                                        Geoffrey W. Crawford, Judge
                                                        United States District Court

21